## JONES v. COMMERCIAL INVESTMENT TRUST.

No. 4068.    Decided August 22, 1924.    (228 Pac. 896.)

1. REPLEVIN—PLAINTIFF MUST PREVAIL ON STRENGTH OF OWN TITLE RATHER THAN ON WEAKNESS OF ADVERSARY'S. Plaintiff in claim and delivery action must prevail on strength of his own title, if at all, and not because of weakness of his adversary's title.

2. SALES—WHETHER CONTRACT ONE OF SALE OR CONTRACT TO SELL DEPENDENT ON INTENT OF PARTIES AS TO TIME OF PASSING TITLE. Under Uniform Sales Act, Comp. Laws 1917, §§ 5110, 5127, 5128, rule 1, whether contract is one of sale or executory contract to sell depends on intent of parties as to time when title shall pass, determinable from nature and terms of contract, trade usages, conduct of parties, and circumstances.

3. SALES—CONTRACT HELD ONE OF SALE RATHER THAN AN EXECUTORY AGREEMENT TO SELL. Where plaintiff left automobile with dealer with understanding that, if dealer sold it for certain price, proceeds might be applied on purchase of particular new car then in dealer's showroom, which was done, held contract was one of sale such that title passed to plaintiff immediately on dealer's receipt of proceeds of old car, though delivery of new one was not to be made until later on payment of balance due.

4. ESTOPPEL—EVIDENCE HELD TO SUPPORT FINDING THAT THIRD PERSON DELIVERED AUTOMOBILE TO DEALER FOR PURPOSE OF SALE. In claim and delivery to recover car purchased by plaintiff from dealer who was being financed by defendant, evidence held to establish that defendant had delivered car to dealer's possession for purpose of sale, not simply to be put on exhibition.

5. ESTOPPEL—EVIDENCE HELD TO ESTABLISH FINANCE COMPANY'S KNOWLEDGE THAT DEALER WOULD DISPLAY AUTOMOBILE AS DEALER'S PROPERTY. In action between finance company and one who had made initial payment on automobile and claimed right

to delivery on payment of balance, evidence *held* to show finance company knew automobile was to be placed in dealer's showroom and knew dealer would hold out to general public that automobile was its property.

6. PRINCIPAL AND AGENT—EVIDENCE HELD INSUFFICIENT TO ESTABLISH DEALER'S AUTHORITY FROM FINANCE COMPANY TO SELL CAR. In action to recover car from defendant who financed dealer selling car to plaintiff, evidence *held* insufficient to establish that defendant had authorized dealer to sell car placed in its custody and held by it under trust receipt and time draft agreement.

7. SALES—TRUST RECEIPT ARRANGEMENT UNDER WHICH AUTOMOBILE DEALER HELD CAR FOR SALE HELD NOT CONDITIONAL SALES AGREEMENT. Negotiable trust receipt under which automobile sales company possessed an automobile, title to which was retained by finance company pending payment of time draft drawn in its favor by sales company, *held* not sale on condition that title should remain in finance company until draft was paid.

8. SALES—RULE STATED AS TO TITLE OF PURCHASER OF GOODS SOLD BY ONE NOT OWNER WITHOUT AUTHORITY. Where goods are sold by a person not the owner, and who does not sell under authority or with consent of owner, buyer acquires no better title than seller had, unless owner is precluded from denying seller's authority to sell.

9. ESTOPPEL—FINANCE COMPANY HELD ESTOPPED TO DENY AUTOMOBILE DEALER'S AUTHORITY TO SELL CAR DISPLAYED BY IT. Finance company, retaining legal title to automobile which it permitted sales company to exhibit and sell under representations that it had title, *held* estopped, after bankruptcy of dealer, to deny his authority to sell and assert right to car adversely to one who had made initial payment on it and was entitled to delivery on payment of balance due.

Appeal from District Court, Third District, Sale Lake County; *A. R. Barnes,* Judge.

AFFIRMED.

See 2 C. J. § 727; 21 C. J. §§ 158, 269; 34 Cyc. p. 1385; 35 Cyc. pp. 25, 27, 277, 278, 279, 280, 303, 323, 331, 357, 655, 681.

Action by Irvin Jones against the Commercial Investment Trust, a corporation. Judgment for plaintiff, and defendant appeals.

*Booth, Lee, Badger & Rich, of Salt Lake City,* for appellant.

*Evans & Sullivan,* of Salt Lake City, for respondent.

WOOLLEY, District Judge.

This is an action in claim and delivery, brought by Irvin Jones, the plaintiff and respondent, against the Commercial Investment Trust, a corporation of the state of New York, defendant and appellant, to recover possession of an automobile, particularly described as one Cleveland sedan, serial No. 30083, motor No. 26443, with all standard calalogue attachments and equipment complete, of the value of $1,500. Both parties claim to own this automobile. Plaintiff had judgment, and defendant appeals.

There is no question raised as to the form or sufficiency of the pleadings in the case, so that it is unnecessary to set them out in this opinion.

The complaint and an affidavit and an undertaking required by our Code were filed on February 23, 1923, and on or about that date the sheriff of Salt Lake county took possession of the car in question from the defendant's agent and delivered the same into the custody of the plaintiff, who had possession at the time of the trial.

The lower court, sitting without a jury, found, in effect, that the plaintiff was the owner, and upon payment of the balance of the purchase price, in the sum of $375, which had been tendered to the receiver of the corporation from whom plaintiff purchased the car and was paid into court in this action, was entitled to the possession of the automobile; that he had purchased the car, as alleged by him, from the Naylor-Woodruff Motor Company; and that the defendant claimed the car in suit by virtue of a three-cornered transaction between the Cleveland Automobile Company, the

manufacturer thereof, the Naylor-Woodruff Motor Company, and the defendant, the nature of which transaction was as follows:

The manufacturing company from time to time from Cleveland, Ohio, shipped to the Naylor-Woodruff Motor Company, at Salt Lake City, Utah, various automobiles, some ten to fifteen in all, including the car in question, of the Chandler and Cleveland makes, in the course of its regular business of marketing its factory products; and at the time of such shipments executed to the defendant separate bills of sale covering the cars so shipped, including a bill of sale covering the car in suit.

Upon the arrival of the car in question at Salt Lake City, and pursuant to the arrangement between the parties in relation to the method of carrying on the business, the Naylor-Woodruff Motor Company paid the freight charges upon the car and paid to the manufacturing company, for the account of the defendant, a sum equal to 20 per centum of the factory price, took the car into its possession, and placed the same upon the floor of the salesroom in its place of business; and that at the same time the Naylor-Woodruff Motor Company executed an instrument called a "negotiable trust receipt," and accepted a time draft, in the sum of $1,044.24, drawn by the manufacturing company, payable to the order of the defendant, due on or before December 1, 1922; the amount of the draft being the balance of the factory price of the automobile due after payment of the 20 per cent. as aforesaid.

The court further found that the negotiable trust receipt was a conditional sale by the defendant to the Naylor-Woodruff Motor Company; that the Naylor-Woodruff Motor Company was a retail dealer in cars, maintaining a salesroom in Salt Lake City; that the car in suit was shipped to that company, by authority of the defendant, for the purpose of sale, and for no other purpose; and that, from the terms of the trust receipt, the nature of the transaction, and all the evidence in the case, it was the intention and understanding between the Commercial Investment Trust

and the Naylor-Woodruff Motor Company, that the former should hold title to the cars so handled until they were sold, whereupon the defendant should forthwith receive the balance due it upon such cars as were sold, and that the Naylor-Woodruff Motor Company was a trustee of the funds received from the sale of the car to the extent of the amount due defendant and until it should remit the same.

The court further found that the defendant well knew that this automobile, together with all other automobiles dealt with in like manner, was to be placed by the Naylor-Woodruff Motor Company upon the floor of its salesroom for the purpose of sale and for no other purpose, and well knew that that company would hold out to the general public that all such cars offered for sale, including the car in question, were the property of that company; that more than ten automobiles had been handled by that company in the same manner as this car was handled, under trust receipts in all respects similar to the one involved here, and that all of those cars had been sold by said company without its having first obtained from the defendant written authority to sell the same; and that the defendant and the Naylor-Woodruff Motor Company, by their manner and method of dealing as above set forth, construed the contract embodied in the time draft and trust receipt to the effect that the company, after it had paid the freight charges on the car and 20 per cent. of the factory price, and had placed the car on the floor of its salesroom, had authority and lawful right to sell the car for cash in an amount not less than the sum specified in the time draft, and upon such sale to convey good and lawful title to the car; and finally that between October 8 and October 25, 1922, there was an authorized consummated sale of the car in controversy by that company to the plaintiff for the sum of $1,875, of which $1,500 was paid in cash and the balance was to be paid by the plaintiff when he called for the car. The assignments of error are sufficient in form and substance to raise the questions discussed in the briefs and in this opinion.

The evidence shows without conflict that Jones owned an

automobile of the Chandler make. He drove this car on the morning of October 8, 1922, into the garage operated by the Naylor-Woodruff Motor Company, which will be referred to at times hereafter as the sales company, in Salt Lake City to be repaired. While he was waiting there his attention became attracted to a Cleveland sedan, the car in suit, which was on display upon the floor of the showroom of the sales company's place of business. This company was engaged in the business of selling automobiles at retail at that place. This car was the only one of its make and kind about the place. Jones and his son made some inspection of the sedan, and Jones and Barkdull and Naylor, who were, respectively, salesman and president of the company, engaged in some conversation about Jones trading his Chandler car for the Cleveland sedan. Jones said he thought he ought to have about $1,500 for his car on a trade, and the sales company asked $1,875 for the new car; but the company could not trade unless it could sell the old car, and Barkdull and Naylor expressed doubts about being able to sell the old car for as much as Jones asked for it, although Naylor stated that he had a party to whom he thought he could sell it for that price, within two or three days, if Jones would leave it there. Jones testified that Naylor said, "don't believe that I can allow you $1,500 on your car, but, if you will leave it two or three days, there is a chance we can place that car in two or three days. Whatever we get for the car we will apply it on this new Cleveland car." Jones in answer to this told Naylor not to take less than $1,500 for the Chandler, and further testified: "So I told him (Naylor), if he thought if he could give me that deal, or give me $1,500 on the new car within the next few days, I would leave the car."

Thereupon Jones left his old car with the sales company under that arrangement and returned to his work in Idaho. The sales company sold the old car about October 15, 1922, for $1,650; being $150 more than Jones had asked for it; but Jones not being advised of this sale on the 23d of October, wrote the company the following letter:

Appeal from Third District

"Grace, Idaho, October 23, 1922.

"Naylor-Woodruff Motor Co.—Gentlemen:   Not hearing from you since I left my car with you just thought I would write and see just what you had done with it. Things has changed somewhat since I left it with you and if you could get me $1,350.00 for it you may have all over that you get. I wish you could sell it for me by November 5 or I will have to send for it.

"Please write and let me know what the repair bill is so I can send it to you.

"Mr. Irvin Jones,
"P. U. Co., Camp No. 1."

Thereafter, and on the following day, presumably in answer to the foregoing letter, the sales company wrote to Jones as follows:

"Salt Lake City, Utah, October 24/22.

"Mr. Irwin Jones, Grace, Idaho—Dear Sir:   We are writing you to-day to advise you that we have sold your car and have your new Cleveland sedan ready and waiting for you.   There is a balance of $375.00 plus the charges for repairs on your Chandler sedan which amounts to $28.50 and which leaves a balance of $403.50 due on the new car.

"Trusting that we may be favored with an early reply, we are,
"Yours very truly,
"Naylor-Woodruff Motor Co."

Jones answered the letter of October 24 on the next day by letter, of which the following is a copy:

"Grace, Idaho, October 25, 1922.

"Naylor-Woodruff Company:   I received your letter of October 24th, stating you had sold my car. Things have changed somewhat with me the reason I wrote you about the car I need the money now and do not the car. That the reason I wanted you to sell the car for me and made you a price of thirteen hundred fifty dollars on it which I expected you to make your profit when I left the car I expected a payment on a farm I sold and now it looks like I would have to wait another year for it and I need the money to pay on my home I just bought in Provo.   So if you could send me a check it would help me a great deal at the present time and as soon as I get back and need the car I will call on you.

"Mr. Irvin Jones, Grace, Idaho,
"P. U. Company, Camp No. 1."

To that letter Jones received no reply.   He further testified in substance that in his conversation with Mr. Naylor it was agreed between them that the price of the Cleveland sedan was $1,875 that in the event of a sale of the Chandler

car the proceeds to the extent of $1,500 would be applied upon the new car; and that upon a sale of the old car for that price Jones would pay the balance due upon the new car at the time he took possession of the same.

The evidence further shows that Jones was unable to leave his work in Idaho to go to Salt Lake City to get the new car until November 21st, and he called for the Cleveland on November 22d. But in the meantime on November 15th a receiver had been appointed by the court for, and had taken over the property of, the Naylor-Woodruff Motor Company, so that when he went to the place of business of that company to get the new car and pay the balance due thereon he found the place vacant and a notice on the door stating that Mr. Heath had been appointed receiver. Thereupon he consulted an attorney who prepared for him and presented to the receiver a tender of payment of the balance due upon the new car and a demand for the possession of the same. The receiver did not deliver the car to Jones, but on the contrary, pursuant to an order made by the district court of Salt Lake County, in the action in which the receiver had been appointed, upon a petition filed by the appellant here, after a hearing of which the respondent had no knowledge or notice, delivered the car into the custody of appellant. This was done about February 20, 1923, and on the 23d of that month respondent obtained possession by the writ issued in this action.

The evidence further shows without conflict that the defendant and appellant, whom it will be convenient to call the finance corporation, was the owner of and possessed of the title to the automobile at the time it was sold by the sales company to Jones. It had acquired the title by purchase from the manufacturer and received a bill of sale therefor. It delivered the car into the custody of the sales company under an arrangement spoken of by the parties as a "floor plan." This floor plan is a method employed by the finance corporation generally throughout the country in its business with retail dealers in automobiles. Under this plan of operations the dealer orders cars from the manufacturer as he

needs them; the latter ships the goods to the place designated by the dealer; the dealer pays the freight charges on the goods and 20 per cent. of the invoice price, which is for the account of the finance corporation, signs an acceptance of a time draft, and also signs a so-called negotiable trust receipt, both representing 80 per cent. of the invoice price of the shipment, which documents are returned to the finance corporation. Thereupon the dealer secures possession of the goods. In the meantime the finance corporation has paid the manufacturer the factory price of the goods and received bill of sale. The time draft is drawn by the manufacturer on the dealer, accepted by the latter, and is payable to the order of the finance corporation. Separate bills of sale, time drafts, and trust receipts are executed for each automobile so handled.

The following are copies of the time draft and trust receipt in this case:

"$1,044.24            Time Draft.            No. 33726.
                    "Cleveland, Ohio, Aug. 31, 1922.

"On or before Dec. 1st, 1922, pay to the order of Commercial Investment Trust, if demand be made, ten hundred forty-four and 24/100 dollars as security for acceptor's obligations under negotiable trust receipt of even number covering Cleveland motor vehicle, serial No. 30083, together with an attorney's fee of 15 per cent., if permitted by law, should the holder elect to require payment and place this draft in the hands of an attorney for collection. Demand, protest, and notice of protest waived. Value received, and charge to

                            "Cleveland Automobile Co.,
                                "By G. Rathvon."
              "Negotiable Trust Receipt
                    "No. 33726.
                    "Salt Lake City, Utah, Aug. 31, 1922.

"Received from Commercial Investment Trust, New York, the owner thereof, Cleveland motor vehicle, sedan serial No. 30083, motor No. 26443, complete with all standard catalogue attachments and equipments, in consideration whereof and of being permitted to display the same in our place of business we agree, at our expense, to warehouse and to hold said motor vehicle in trust for the holder of time draft of even number herewith (which we have this day accepted) as their property, and agree to return on demand in good order and unused, but with liberty to us to exhibit,

and, after first obtaining their written consent (but not otherwise), to sell the same for their account for cash for not less than $1,044.24, and we further agree that in the case of such sale to keep the proceeds separate from our funds and immediately hand the proceeds to them without expense or cost to the holder of said time draft. The acceptance of time draft equal in amount to the value of said motor vehicle shall not be effective to terminate this trust, but said draft and any sums delivered by us shall be security for the performance of the things obligatory upon us hereunder and all other obligations to holder of said time draft.

"We further agree to keep a separate account of all motor vehicles delivered to us under this or any like receipt and of the proceeds thereof when sold, to report any sale to the holder of said time draft immediately after the same is made and to furnish to them on the 1st day of each month a true and complete report for the preceding month. We will also permit them or their duly accredited representatives to examine our books and the cars in our possession at all reasonable times during business hours.

"Commercial Investment Trust shall, during the entire time said car is held hereunder, keep said car insured against loss by fire and theft, and cause a surety bond for the accounting for the car or proceeds thereof to be issued, and in the event of our failure to redeliver the said car on demand we shall, until redelivery thereof, pay as damages for detention for each month or portion thereof after demand 1 per cent. of said sale price.

"We further agree to pay all costs, charges, expenses, and disbursements including a reasonable attorney's fee (15 per cent. on sale price of car, if permitted by law) should the holder hereof find it necessary to protect his property in said car by placing it in the hands of an attorney, and that the waiver of any default shall not operate as a waiver of subsequent defaults, but all rights hereunder shall continue notwithstanding any one or more waivers. We acknowledge receipt of a true copy of this agreement.

"Naylor-Woodruff Motor Company,

"By M. D. Naylor, Pres.

"Witness: Henry Cannon."

The floor plan is set out in a printed circular which, it seems, is sent by the finance corporation to the dealer who makes application for financial support. It purports to explain to the dealer the method by which the business is to be conducted. Among other provisions it contains the following, which is the only part thereof pertinent to this case:

"Although dealer has possession of cars, title remains with C. I. T., and cars are not to be used for demonstrating or any other purpose.

"Expiration date of trust receipt must be strictly observed. Certified check or bank draft for amount set forth in trust receipt must be sent to C. I. T. in lieu of time draft, sufficiently in advance to reach C. I. T. at New York on or before maturity date. No remittances are regarded as made to C. I. T., unless by certified check or bank draft to its order deposited in United States mail addressed to C. I. T. at 347 Madison avenue, New York City.

"Cars may be sold prior to expiration date, if, before car is delivered, dealer sends C. I. T. certified check or bank draft for amount set forth in trust receipt. Unless dealer remits as above before car is delivered, purchaser does not get title to car."

The evidence further shows in this connection that the Naylor-Woodruff Motor Company began its business relations with the finance corporation in February, 1922. Between that time and October 15 of that year the sales company handled and sold about ten carloads of automobiles (the court found it was more than ten automobiles) under the foregoing arrangement. In no instance did the sales company before making a sale obtain written permission from the finance corporation thereto. But it invariably, except in two instances, mailed its check (but not a certified check nor a bank draft) in the amount of the trust receipt to the defendant on the day of the sale or the day thereafter, all of which checks were eventually paid, so that the finance company received payment for all the cars which were sold by the sales company, except this one. The finance corporation employed some one in Salt Lake City to visit the sales company's place of business each month and ''check up'' on the cars then on hand. This inspector made reports to the finance corporation upon the results of his inspections. In two instances he found, and so reported, that the sales company had permitted cars to leave the floor of its salesroom without first having deposited in the mail checks covering the corresponding trust receipts and time drafts. The company promptly, by telegraph, took such steps as were necessary to induce the sales company forthwith to send the amounts due on those cars.

It is shown, finally, that the sales company failed, and on November 15, 1922, a receiver was appointed for its property, and that its assets were so few and its liabilities so

many that neither Jones nor the finance corporation can re-
cover anything upon a claim if one were presented for
$1,500 received by it from the sale of Jones's old car or for
the $1,044.24 which the finance corporation has invested in
the new car.  The sales company did not pay to the finance
corporation, the holder of the trust receipt and time draft,
the $1,044.24 shown in those instruments, nor any part
thereof.  The finance corporation had no knowledge of the
purported sale to Jones until after the failure, and repos-
sessed itself of the car from the receiver.  It is testified to
by a witness for the trust company that it never did give
Naylor-Woodruff Motor Company any authority to sell the
car except in conformity with the terms of the trust receipt,
and that no written authority was given in this case.  Jones
had no knowledge, actual or constructive of the relationship
existing between the finance corporation and the sales com-
pany with respect to this property.  He made no inquiries
as to the right of the sales company to sell the car, but as-
sumed that it had such right.

The first point to be considered is the claim made by ap-
pellant that, assuming that the sales company had authority to
make the purported sale, the transaction between Jones and
the sales company amounted to no more than an executory
contract upon the part of that company to sell to him the
new car and not to a sale thereof; hence that no title had
passed to Jones at the time the receiver was appointed for
the company, in which event his only remedy thereafter was
against the company on the contract or to file his claim with
the receiver.  If this position is correct, then the plaintiff
must fail, it is argued, because of the doctrine that
a plaintiff in a claim and delivery action must recover          1
upon the strength of his own title and not because of
the weakness of that of his adversary.  The respondent's
position, on the other hand, is that the title to the new
car passed to and became vested in Jones the instant the
company sold his old car, although the company was entitled
to retain the possession of the new car, under the contract
until the balance of $375 due thereon should be paid or

tendered; in other words, that it was a contract of sale and not a contract to sell.

A sale involves a present transfer of the title in the goods from the seller to the buyer. A contract to sell implies that the title in the goods remains vested in the seller and is to be transferred to the buyer at some future time. Whether a contract is one of sale or an executory contract to sell depends always upon what the parties to it intend in regard to the time when the title in the property is to go to the buyer. If they intend the title to be transferred when the contract is made, it is a contract of sale; otherwise it is a contract to sell. The intention of the parties is. the important and controlling fact to be considered and given effect in determining the nature of a contract in this regard. There may be a sale, a present passing of the title, notwithstanding that by the terms of the agreement the right to the possession of the thing sold is retained by the seller until the purchase price is paid. The intention must be determined from a consideration of the nature and terms of the contract, usages of trade, the conduct of the parties, and the circumstances of the case. If no contrary intention appears from such a consideration, then the law presumes, where the contract pertains to a specific chattel, in a deliverable state, that the parties intend the title to pass when the contract is made, and this is true regardless of the fact that payment of the price or delivery of the goods, or both, be postponed.

The foregoing propositions are elementary. They are to be found in the provisions of the Uniform Sales Act, Comp. Laws Utah 1917, §§ 5110, 5127, 5128, rule 1. Respondent cites in the brief the following additional authorities: Williston on Sales, §§ 594, 595; Shinn on Replevin, §§ 166, 167; Cobey on Replevin (2d Ed.) § 289; 24 R. C. L. 23, § 284; *Abraham* v. *Karger*, 100 Wis. 387, 76 N. W. 330; *Estis* v. *Harnden*, 158 Mo. 381, 134 S. W. 43; *Witt* v. *Dersham*, 146 Mich. 68, 109 N. W. 25; *Ilgenfritz* v. *R. R. Co.*, 169 Mo. App. 652, 155 S. W. 854; *Carpenter* v. *Roach*, 55 Okl. 103, 155 Pac. 237; *Brooks* v. *Tyner*, 38 Okl. 271, 132 Pac. 683; *Strong,*

*Deemer & Co.* v. *Dinniny,* 175 Pa. 586, 34 Atl. 919; and *Beardsley* v. *Beardsley,* 138 U. S. 262, 11 Sup. Ct. 318, 34 L. Ed. 928. See, also, 35 Cyc. 279(c), 277(2), 302(4), 331(11), and 24 R. C. L. 15, § 275.

The parties to the contract now under discussion seem not to have expressed any intention whatever in regard to when the title in the new Cleveland sedan should vest in Jones. They say nothing about that matter in the conversation on the morning of October 8, nor in any of the correspondence which passed between them. Jones agreed, in effect, that he would buy the new sedan and pay $1,875 for it, if and when the sales company sold his old car for $1,500 net to him, the proceeds of the sale to that amount to apply upon the price of the new car, and that he would pay the balance of $375 when he took possession of the new car. Both parties understood and intended that the sales company should retain the right to the possession of the sedan until the entire price was paid. The company did sell the old car for more than the amount which Jones asked for it and received the money, so that Jones, as a result of that transaction, in fact paid $1,500, which is all that he claims in this action, toward the price of the new sedan. To all intents and purposes, the situation was then the same as if Jones had stepped into the sales company's office and handed over $1,500 in money as a part payment on the automobile then on exhibition in the showroom, and had said that he would return within a few days and pay the balance of $375 and take the new car.

There is no question raised in this court that the contract did not relate to the identical automobile involved in this action. It is the car which was on the floor of the salesroom when the discussion was had; it was the only automobile of its kind there at that time; it is the car which Jones and his son examined, and the car about which Jones, Naylor, and Barkdull talked; and it is undoubtedly the car which the sales company had in mind when it wrote to Jones, on October 24, telling him that we "have your new Cleveland sedan ready and waiting for you"; and it is the car which

Jones later came down from Idaho to get.  Nor is any sug-
gestion made here that the Cleveland sedan was not on
October 8, and at all times thereafter, in a deliverable state.
That question was not raised in the court below.  Nothing
whatever remained to be done, so far as the evidence dis-
closes, by the sales company to put the automobile in con- ·
dition for delivery.  The price was agreed upon, the terms
of payment fixed, the property identified.  The sales com-
pany was not obliged to send the property to the purchaser,
for it was understood that Jones would call and get the
new car.  In fact, nothing remained to be done by either
party to the contract to complete the entire transaction,
upon the sale of the old car, except for Jones to pay the bal-
ance and take the new sedan.

The fact that Jones paid $1,500 of an agreed price of
$1,875 is a circumstance which may be said to point to the
conclusion that he intended to become the owner of the new
car when his old car was sold, because a man would not, gen-
erally speaking, perhaps, make such a substantial payment
upon a mere executory contract; while the tenor of the let-
ter of October 24, written in answer to Jones's letter of the
day before, in which he made a proposition different from
the original contract, may be said not only to manifest an
intention upon the part of the sales company to hold him
to a performance of his contract but also to show that the
company considered that Jones had purchased the new sedan.
These facts, while not conclusive, are very persuasive.
Against them is set the fact that the sales company retained
the right to possession until full payment of the price; but
that fact does not necessarily point to the conclusion that
the parties intended that the title should not pass until that
time and event, because the retention of the possession of the
automobile was, in the circumstances shown, ample security
for the payment of the remainder of the price.

I am of opinion, therefore, having regard to the nature
of the contract, the circumstances of the case, and the con-
duct of the parties and no contrary intention appearing, since
the contract relates to a specific chattel, in a deliverable
state, that the parties intended the title to the new car to

vest in Jones when the contract was made, or completed; namely, when the company sold his old car and received the proceeds of such sale to apply upon the purchase price of the new Cleveland sedan. At that instant the transaction between Jones and the sales company, which until then had been contingent and conditional, ripened into an executed contract of sale, and whatever title the Naylor-Woodruff Motor Company had in the new car passed to and became vested in the purchaser. In so far as those parties are concerned, if the Naylor-Woodruff Motor Company owned the car or had a lawful right to sell the same, Jones thereafter was the owner of the title, and was entitled to the possession upon tender of the balance which he had agreed to pay. The trial court was right when it so held, and the assignments upon this branch of the case must fail.

The trial court found as a fact that the automobile was shipped to the sales company by authority of the finance company for the purpose of sale and for no other purpose. Appellant challenges this finding, saying that it is not supported by, but is contrary to, the evidence because of the declaration in the trust receipt in which the dealer acknowledged receipt of the property with liberty to display and exhibit the same. But the court was not bound in this case and in this connection alone by what the dealer said in the trust receipt, even if that instrument may be said to negative the idea that such was the purpose and intention of the parties. The court had a right to look to the entire transaction between the parties to determine their purpose and intention when the finance corporation placed the automobile in the possession of the dealer. The evidence in regard to the business in which the parties were engaged, which showed that there was a company which manufactured the cars; there was the defendant, furnishing money with which to finance dealers in those cars, and the dealer who sold the cars to the public; the purpose of the floor plan arrangement; the business between the parties with respect to other cars handled in like manner; and the testimony of two of

the defendant's own witnesses, Mr. Woodruff and Mr. Barkdull, who said that the sales company had this car for sale—all points to but one reasonable conclusion; namely, that the automobile was shipped to the dealer to be sold and not simply to be put on exhibition. No other finding upon that issue was possible in view of the evidence before the court.

The trial court also found as a fact that the finance company knew that the automobile was to be placed on the floor of the salesroom of the dealer for the purpose of sale and for no other purpose, and well knew that the sales company would hold out to the general public that said automobile was the property of that company. Appellant says that this finding is not supported by the evidence. Again we think that the evidence is all one way and that it is in support of the finding. The only part of the finding about which there can be any question, it seems to me, is the part saying that the finance corporation knew that the sales company would hold out to the public that the automobile was its property. But even that, I think, is a fair conclusion to be drawn from all the evidence. The finance corporation authorized the property to be shipped to the dealer for the purpose of sale; it knew that the Naylor-Woodruff Motor Company was in fact, and was holding itself out to be, a retail dealer in cars of that make; it knew from the very purpose of the whole transaction that the dealer would place this car on display and would exhibit the same in its salesroom for the purpose of inducing members of the public to become purchasers; and it knew from the reports of its inspectors that it did in fact exhibit this automobile for sale in its showroom. There is nothing in the floor plan or in the trust receipt or in any communication between the parties to show in what capacity, if any, the finance corporation expected or required the dealer to represent itself when offering this car for sale and in selling the same. What light we have from the dealings of the parties in respect to the other cars which were handled under similar arrangements indicates that the dealer in all those cases held itself out to be the owner and sold them as if it were the owner. In no

instance so far as the record shows did the sales company
hold out or advertise that it was selling those cars as trus-
tees, bailee, agent, conditional vendee, or otherwise than as
owner. The sequence of title in all those cases seems to have
been, as no doubt the parties intended it to be in this instance,
from the manufacturer to the trust company, from the trust
company to the dealer, and from the dealer to the retail
purchaser; not from the manufacturer to the trust company
and thence to the retail purchaser through the dealer as
agent or trustee for the trust company. The finding upon
that issue is well supported by the evidence.

The trial court rested the judgment upon the finding that
the sale to Jones was authorized by the finance corporation.
It held and found, in substance, as heretofore pointed out,
that the transaction between the finance corporation and the
dealer, whereby the automobile was placed in the custody of
the latter, amounted to a contract which the parties con-
strued to the effect that the dealer, after paying the freight
and 20 per cent. of the factory price of the car, and placing
the same upon the floor of its salesroom for sale, had au-
thority and lawful right to sell the property for cash in an
amount not less than the sum shown in the trust receipt and
time draft, and upon such sale to convey good and lawful
title to the purchaser. This finding is vigorously as-
sailed by the appellant. It is manifestly erroneous,        6
because it is not only not supported by any evidence
but is contrary to the undisputed evidence.

In the floor plan, which is set out in a printed circular
sent to the dealer making application to the finance corpora-
tion for financial accommodation, and which explains the
manner in which the business is to be conducted under that
arrangement, the finance corporation says to the dealer that
cars may be sold prior to the expiration date of the time
draft and trust receipt, which in this instance was Decem-
ber 1, 1922, if, before car is delivered to purchaser, dealer
deposits in the mail, directed to the owner at its place of busi-
ness in New York City, a certified check or bank draft in
the amount shown in the trust receipt. Unless dealer remits
as above, declares a statement on the floor plan, purchaser

does not get title to the car, while the dealer says in the trust receipt that it holds the property in trust for the holder of the time draft with liberty in the dealer to sell the same for the owner's account, after first obtaining the owner's written consent, but not otherwise.

From the foregoing it clearly appears that the parties have expressed the intention and understanding that the dealer should have no right or power to sell the automobile except upon one of two conditions, namely: First, that before making a delivery thereof the dealer should deposit in the mail, directed to the owner at its place of business in New York City, a certified check or bank draft in the amount shown in the trust receipt; or, secondly, that the dealer, before making a sale, should obtain the written consent of the owner so to do. No doubt, also, it may be remarked here that the dealer upon complying with either of those conditions would have the right to sell the car. Neither of those conditions was met in this case. The evidence is without conflict in that respect; no claim whatever being made to the contrary. Therefore the sale by the Naylor-Woodruff Motor Company to Jones was an unauthorized sale. The fact that the finance corporation waived both of those conditions with respect to a large number of sales of cars held by the dealer under similar contracts, wherein the dealer at the time of or soon after the sales sent its personal checks to the finance corporation, affords no evidence in support of the conclusion that it had also waived those conditions, or either of them, in this case. That is the only evidence there is in the record which it is claimed supports the theory of waiver. But about all that that evidence shows is that, if the Naylor-Woodruff Motor Company had remitted to the finance corporation by its personal check or otherwise, the amount of the trust receipt, out of the funds which it received when it sold Jones's old car, as it should have done, then the finance corporation would probably have accepted the money and waived the conditions mentioned. To establish a waiver here it should at least be made to appear that the finance corporation knew, before

the matter became controversial, that the dealer had sold the car to Jones without written permission or without having remitted the amount of the time draft, and that, having such knowledge, it nevertheless acquiesced in or ratified the sale; and, furthermore, in order for the claim of waiver to be effectual in Jones's favor, that Jones acted upon and changed his position in reliance upon the fact that the finance corporation had waived those provisions of the contract. *Hawkins v. Smith,* 35 Idaho, 349, 205 Pac. 188.

With that part of finding No. 7 in which the court finds that the negotiable trust receipt is a conditional sale of the automobile by the trust company to the dealer, the condition presumably being that the title should remain in the former until the time draft was paid, we are unable to agree. Waiving the point that the construction of the trust receipt is a question of law and not a question of fact, or at most a mixed question of law and fact (see case note in L. R. A. 1917B, 626), the instrument itself, which is set out in full above, contains no express agreement upon the part of the one party to sell and the other party to buy the property, nor any language from which such a contract between them may be implied. It speaks in the language of a trust and not in the language of a sale. It may well be that, if such an issue had been presented in the pleadings, and the court had been called upon to make a finding upon the point, there is sufficient evidence in the record relating to the entire transaction between the parties from which the court might have found in fact that there was an implied contract between them by which the sales company was bound to sell to the dealer, at any time before the due date of the time draft, if the dealer wished to buy and paid or tendered the amount of the draft. But that issue was not raised in the pleadings, and that is not what the court found. What the court did find is that the trust receipt itself is a conditional sale. It is clearly not that, whatever else it may be; and for the reason pointed out, if for no other reasons, this finding is not binding upon this court.

It does not seem to be necessary to a proper determination of the case to attempt an exact definition of the relationship

existing between the appellant and the Naylor-Woodruff Motor Company. It may be assumed that they stood in the relation of conditional vendor and conditional vendee, or cestui que trust and trustee, bailor and bailee for the purpose of sale, principal and agent, or in some possible legal combination of these relationships. The question is not raised, though it is discussed in the briefs. From whatever standpoint the case is viewed the fact remains, admitted by everyone, that the legal title to the automobile, at the time of its sale to Jones, was vested in the appellant and not in the dealer; and it is likewise true that it was the intention of the parties, clearly and unmistakably expressed, that it should remain there until the time draft was paid, except in case of a sale made with written permission, in which event the dealer was to stand charged as trustee of the funds in a sufficient sum to pay the draft. Nor is any claim made that the trust receipt and the floor plan arrangement between appellant and the dealer were not entirely legal, not only as between the parties to them, but in the absence of estoppel, as to others as well. Respondent in the brief says that the transaction was a conditional sale with additional features, while the appellant says it was a trusteeship in the nature of a bailment for the purpose of sale. Perhaps they are both right, if a conditional sale may be said to include a contract which is optional with either side; so that the validity of the arrangement may be assumed. No recording statute is involved.

The principal ground upon which the respondent relies to support the judgment is that of equitable estoppel. That is the only ground upon which he can stand, if Naylor-Woodruff Motor Company made the sale in a manner not authorized by its contract with the appellant. For it is written in the Uniform Sales Act, and it is a fundamental principle of the law that where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority of or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct        8

precluded from denying the authority of the seller to sell. Section 5132, Comp. Laws 1917; *Alexander* v. *Busch,* 166 Pac. 900, L. R. A. 1918E, 125. I turn, therefore, to a brief discussion of that subject in the light of the facts in the case and the findings of the court which are supported by evidence.

In *Lewenberg* v. *Hayes,* 91 Me. 104, 39 Atl. 469, 64 Am. St. Rep. 215, the plaintiff sold to one D., a tradesman, certain merchandise, half cash and half in thirty days, and delivered the goods without exacting the cash. It was held that the plaintiff was estopped as against an innocent purchaser from D. from claiming that the sale was conditional and that the title had not passed, because of the implied authority he had given D. to sell the goods. "The plaintiff allowed the defendant to be deceived, and he cannot now be permitted to take advantage of his own fault. Merely intrusting goods to another, without knowledge that they were to be put on sale, would not raise an estoppel; * * * but knowledge that they are to be put on sale and acquiescence in allowing them to be so exposed is equivalent to authority to sell them and well may raise an equitable estoppel."

In the case of *Burbank* v. *Crooker,* 7 Gray (Mass.) 158, 66 Am. Dec. 470, involving a sale of a stock of goods, in bulk, in a country store, bought conditionally, that title should not pass until paid for, the court, speaking by Dewey, J., held that the purchaser took no better title than that held by the original vendee, but says that, had sale been made of individual articles in the ordinary course of business, a different rule would prevail; and that the plaintiff might have been estopped to assert any right adverse to such purchaser.

In the case of *Rogers* v. *Whitehouse,* 71 Me. 222, Whitehouse being assignee for the benefit of creditors, that court held that a conditional sale of goods to a retail merchant is binding upon him and his assignees, but not upon vendees in the regular course of business; and that one to whom he sells the whole stock took no title. Neither would his assignee in bankruptcy.

In the case of *Gramm-Bernstein Truck Co.* v. *Todd et al.,* 121 Wash. 145, 209 Pac. 3, the Supreme Court of the state of Washington applied the doctrine of estoppel against the actual owner of an automobile truck in a situation similar in essential features to the situation presented in the case at bar.

In the case of *Clarke Bros.* v. *James McNatt,* 132 Ga. 610, 64 S. E. 795, 26 L. R. A. (N. S.) 585, the court quotes with approval from 1 Mechem on Sales, § 601, as follows:

"But the rule permitting the conditional vendor to retake his goods in case of default, even from a bona fide purchaser from his conditional vendee, very obviously should not, and does not, apply in those cases in which the goods have been delivered to the conditional vendee for the very purpose of being resold to such a purchaser; as where a retail dealer obtains goods from a wholesale dealer upon the agreement that the title to the goods as a bulk shall remain in the latter, but the retail dealer is impliedly, if not expressly, permitted to sell from the bulk in the usual course of trade. A sale of the goods in bulk might be deemed unauthorized and pass no title, but the retail purchaser in the usual course of business would, where such resales were expressly or impliedly authorized, obtain a good title, though the retail dealer might fail in paying for the goods."

See, also, *Wendling Lbr. Co.* v. *Glenwood Lbr. Co.,* 54 Cal. App. 691, 202 Pac. 929; *Boice* v. *Finance & Guaranty Corp.,* 127 Va. 563, 102 S. E. 591, 10 A. L. R. 654; *O'Neil* v. *Cheatwood,* 127 Va. 96, 102 S. E. 596; *Trousdale* v. *Winona Wagon Co.,* 25 Idaho, 130, 137 Pac. 372.

In the case of *Glass* v. *Cont. Guaranty Corp.,* 81 Fla. 687, 88 South. 876, 25 A. L. R. 312, the Supreme Court of Florida had before it a case very similar to this one upon the facts. In that case it was shown that the Continental Guaranty Corporation was engaged in the same kind of business in which the appellant here was engaged. One Zimmerman was a retail dealer in automobiles of a particular make in the city of Jacksonville. The corporation placed an automobile in the possession of the dealer upon a time draft and trust receipt arrangement; the latter being in essential particulars like the trust receipt in this case. It was assumed by the court, apparently upon the basis of the stipu-

lated state of facts, that the arrangement by which Zimmerman came into the possession of the car was a conditional sale. Glass purchased the automobile from Zimmerman and took possession, and the corporation recovered it in an action of claim and delivery. The Supreme Court, in reversing the case, said:

"It is a general principle, applicable to traffic in personal property that no one can transfer or confer a better title than he has, unless some principle of estoppel operates to bar a claim under an otherwise better title. The mere possession of chattels, by whatever means acquired, if there is no other evidence of property rights therein or of authority to sell, given by or for the true owner, will not enable the possessor to give a good title. 24 R. C. L. 374-377. But the true owner may under some circumstances be estopped to claim against a bona fide purchaser for value. See *Edwards* v. *Baldwin Piano Co.*, 79 Fla. 143, 83 South. 915.

"In England, at common law, a sale in market overt confers a title upon a bona fide purchaser though the seller had no title whatever; but in this country there are no such markets, and the principle of title acquired by purchase and sale in market overt does not obtain. 24 R. C. L. 378.

"The mere possession of personal property is only prima facie evidence of title; and a purchaser of personal property from one who has only the possession of the property under an incomplete conditional sale cannot in general defeat a recovery by the true owner, although such purchaser bought for value and without notice (citing cases).

"But where an owner consigns personal property to a dealer in such goods with express or implied authority to sell, or delivers or consigns to another personal property with indicia of ownership, or of authority to sell, but with title reserved in the owner until the payment of the purchase price, a purchaser, who pays value for such goods and gets possession thereof without notice of the terms or conditions of the original delivery, consignment or sale, obtains a good title as against the original owner, which will in general prevail against the latter's reserved title. See *Bent* v. *Jerkins*, 112 Ala. 485, 20 South. 655; 24 Am. & Eng. Ency. Law (2d Ed.) 1165; Mechem on Sales, §§ 157, 166; 35 Cyc. 680; *American Process Co.* v. *Florida White Pressed Brick Co.*, 56 Fla. 116, text 120, 47 South. 942, 16 Ann. Cas. 1054.

"Where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss" (citing cases).

On the facts that case cannot in any respect material to this discussion be distinguished from the case at bar, although in the Glass Case the purchaser took possession of the automobile when he purchased it; while in the instant case Jones failed to obtain possession until the commencement of the suit. But that difference, it seems to me, is wholly immaterial, for possession here would have conferred upon Jones no better right to the car than he already had.

Upon the authority of the cases and texts cited and the principles of law which are so clearly and concisely stated in the Glass Case, supra, which seem to be reasonable and just principles, I am of the opinion that when the appellant placed its automobile into the possession of the Naylor-Woodruff Motor Company for the purpose of sale, knowing that the latter was a retail dealer in such cars, and that it would hold out and advertise itself as the owner thereof and as having the right to sell the same, and permitted the dealer to exhibit the car for sale in its salesroom, under the circumstances shown in this case, it thereby clothed the dealer with such apparent ownership and authority to sell that it ought to be and is estopped to deny as against Jones, who purchased the car from the dealer in good faith, for full value, in the regular course of the seller's business and at retail, and without any knowledge or notice of the appellant's claim thereto, that the dealer had the right to make the sale and to assert its superior title to the car. To hold otherwise under the facts shown in this case would be to open the door to fraud and sharp practice; and would be carrying entirely too far the doctrine that the owner of personal property may give the same into the possession of another upon such conditions as they may agree upon and then repossess himself thereof, upon a breach of those conditions, even as against innocent third persons claiming under his conditional vendee or agent.

In this view of the case, the errors of the trial court which are heretofore pointed out become immaterial and harmless. The judgment is right and does justice between the parties. It is therefore affirmed, at appellant's cost.

GIDEON, THURMAN, FRICK and CHERRY, JJ., concur.

WEBER, C. J., did not participate herein.